## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated,

Plaintiff,

v.

RECKITT BENCKISER, INC.; RECKITT BENCKISER LLC; RECKITT BENCKISER PHARMACEUTICALS, INC.; RECKITT BENCKISER HEALTHCARE (UK) LTD.; and RECKITT BENCKISER GROUP plc,

Defendants.

C.A. No. _____

**JURY TRIAL DEMANDED**

**CLASS ACTION**

## CLASS ACTION COMPLAINT

Plaintiff Rochester Drug Co-Operative, Inc. ("Plaintiff") brings this class action on behalf of itself and all others similarly situated against Reckitt Benckiser, Inc., Reckitt Benckiser LLC, Reckitt Benckiser Pharmaceuticals, Inc., Reckitt Benckiser Healthcare (UK) Ltd., and Reckitt Benckiser Group plc (together, "Reckitt"), and alleges as follows based on: (a) personal knowledge; (b) the investigation of counsel; and (c) information and belief:

### I.     NATURE OF THE ACTION

1.     This is a civil antitrust action seeking treble damages arising out of Reckitt's overarching anticompetitive scheme to exclude competition from the market for co-formulated buprenorphine hydrochloride and naloxone hydrochloride dihydrate ("co-formulated buprenorphine/naloxone"), which Reckitt sells under the brand-name Suboxone.  As alleged below, Reckitt used various acts and practices as part of an overall scheme to improperly maintain and extend its monopoly power in the market for co-formulated buprenorphine/

1

naloxone, to the detriment of Plaintiff and the class of direct purchasers it seeks to represent (as defined below), causing them to pay overcharges.

## II.    FACTS PERTAINING TO RECKITT'S ANTICOMPETITIVE SCHEME

2.    Co-formulated buprenorphine/naloxone is a unique combination drug product composed of two active pharmaceutical ingredients used together as opioid replacement therapy for the maintenance treatment of opioid dependence (*e.g.*, heroin addiction).  The buprenorphine supplies the patient with a maintenance dose of a semi-synthetic opioid, absorbed through the oral mucosa.  The naloxone, in theory at least, serves to prevent the patient from abusing the buprenorphine, by blocking the action of the buprenorphine and thereby precipitating immediate withdrawal symptoms if the buprenorphine is, for instance, ground, put into solution, and injected intravenously.  The naloxone in Suboxone will not have such a blocking effect, however, if the buprenorphine is used sublingually, as directed; naloxone is poorly absorbed through the oral mucosa.

3.    When Reckitt introduced Suboxone, buprenorphine and naloxone were no longer innovative drugs; in fact, they were quite old.  Naloxone was first approved by the Food and Drug Administration ("FDA") in the 1970s.  Buprenorphine was first approved by the FDA in 1982 as an injectable analgesic (pain) drug, first marketed by a predecessor to Reckitt.  Much of the research to investigate buprenorphine's utility in opioid dependence was paid for by taxpayers, through grants to Reckitt from the National Institutes of Health.  Thus, when it introduced Suboxone sublingual tablets in 2002, Reckitt knew that neither Suboxone's components nor their use in opioid replacement therapy had any patent protection.  In fact, in its application to the FDA for approval of Suboxone, Reckitt stated that it "has no knowledge of any

patent that claims the drugs or any methods of using the drugs that are the subject of this application."

4.      Reckitt did have some protection against generic competition to Suboxone, however.  When Suboxone was approved, FDA granted Reckitt a 7-year period of regulatory exclusivity, categorizing Suboxone as a so-called "orphan drug."  *See* 21 U.S.C. § 360aa-dd. During that period of exclusivity, Reckitt marketed Suboxone tablets free from competition from generic co-formulated buprenorphine/naloxone, garnering United States sales of over $1 billion per year, far above the commercial potential that typically entitles a drug company to orphan drug exclusivity, and contrary to Reckitt's representation in its successful application for orphan drug exclusivity that there was no reasonable expectation that Reckitt could recover the costs associated with making and developing the drug (most of which, as stated above, was borne by taxpayers, in any event).

5.      Reckitt's 7-year orphan drug exclusivity for Suboxone tablets was set to expire on October 8, 2009, and with the end of that exclusivity Reckitt knew would come less-expensive generic competition to Suboxone.  Given how expensive Suboxone is for patients (30 tablets in the 8 mg dosage strength had an average wholesale price in early 2011 of $242.90 — over $8 per tablet), generic competition promised substantial competitive relief for patients and purchasers.

6.      By contrast, the prospect of generic competition was alarming to Reckitt, because Suboxone formed a substantial portion of Reckitt's revenue and profits.  Reckitt knew that generic competition posed a substantial threat to those profits.  Since generics are generally priced significantly below that of the brand-name drug, such products typically take the vast

majority of the brand-name version's sales directly and quickly after their introduction into the marketplace.

7.     Not satisfied with 7 years of government-bestowed exclusivity for a drug largely developed and reimbursed by taxpayer money (Suboxone patients are disproportionately Medicaid recipients), Reckitt concocted a multifaceted anticompetitive scheme, executed over the course of several years, to maintain and extend its monopoly power over co-formulated buprenorphine/naloxone, by illegally preventing generic manufacturers from effectively competing with Suboxone.  Reckitt's scheme was executed through a purposeful and planned manipulation of the complex distribution and regulatory approval systems for pharmaceutical products in the United States.  The scheme comprised a number of steps.

**A.     Step One:  Reckitt Develops Suboxone Film**

8.     First, in July of 2007, more than two years before its orphan drug exclusivity expired, Reckitt announced to the FDA that it planned to apply to market a sublingual film version of Suboxone.  Reckitt ultimately filed its application on October 21, 2008.  Medically speaking, the film was equivalent to the tablets.  Its dosage strengths were the same as the tablets.  In fact, Reckitt obtained FDA approval of the film version of Suboxone based almost entirely on previous studies by which the safety and efficacy of the tablets was demonstrated. Reckitt performed no efficacy studies on Suboxone film itself.  Reckitt simply showed that the film version had sufficiently equivalent bioavailability compared with the tablet version.  Reckitt itself told the FDA any differences between the film and the tablet were "clinically insignificant."

9.     There was one quality that Suboxone film possessed that made it different from Suboxone tablets, however.  That difference was its dosage form.  In deciding to market a new

version of Suboxone, Reckitt intentionally decided to make its dosage form (film) different from Suboxone tablets.  It did this for one reason and one reason alone:  it knew that generic Suboxone tablets would not and could not be considered "AB-rated" to branded Suboxone film, and so pharmacists would not and could not legally substitute less-expensive generic Suboxone tablets when presented with a prescription for Suboxone film.  Such automatic substitution of less-expensive AB-rated generics at the pharmacy counter is the means by which generic competition is supposed to reduce drug prices.  Disrupting this competitive mechanism was Reckitt's entire reason for introducing Suboxone film:  to the extent it could introduce its film version of Suboxone and cause the prescription base of branded Suboxone tablets to disappear, Reckitt would be able to hobble generic Suboxone tablet competition and prevent prices for co-formulated buprenorphine/naloxone from dropping to competitive levels.

10.     Reckitt met with significant difficulty getting Suboxone film approved by FDA. FDA rejected Reckitt's application to market a film formulation of Suboxone on August 21, 2009 — less than two months before Reckitt's exclusivity on its tablet formulation was set to expire — because FDA was concerned that the film formulation could be misused, abused, or accessed by children.  Ultimately, after Reckitt submitted a Risk Evaluation and Mitigation Strategy ("REMS") to address these issues, the film formulation was approved by FDA on August 30, 2010, and Reckitt proceeded to market Suboxone film.

11.     Suboxone film is not manufactured by Reckitt.  It is manufactured for Reckitt by MonoSol Rx LLC in Warren, New Jersey, which charges Reckitt substantial sums.

## 1.     Suboxone Film Was Inferior to Suboxone Tablets

12.     The new film formulation offered no medical or clinical benefits over the existing tablets, something FDA expressly recognized.  On the contrary:  the film formulation had

numerous drawbacks.  Naloxone bioavailability with the film version was increased relative to the tablet version, risking unwanted precipitation of opioid withdrawal — the very condition Suboxone is supposed to stem — and therefore unsuccessful induction and stabilization of patients taking the film.  The new film formulation was easier to conceal than was the tablet version, and thus more susceptible to diversion, as Reckitt itself learned before Suboxone film was approved by the FDA:  almost 6,000 strips (46% of those dispensed to study patients) were "missing" after the limited clinical studies Reckitt performed to support FDA approval.  The new film formulation was easier to dissolve and inject than the tablet formulation, defeating a major virtue of Suboxone was supposed to carry:  a low abuse potential.  The new film formulation was also more dangerous for children who accidentally ingest Suboxone:  because the film dissolves rapidly, children who accidentally place Suboxone film in their mouths tend to absorb the buprenorphine it contains quickly and completely, and the film cannot be spit out or removed from the mouth.  This is because, upon introduction into the mouth, Suboxone film hydrates to a gel within approximately 30 seconds, and erodes completely over the course of 3 minutes, releasing all the buprenorphine.  In contrast, Suboxone tablets have a much longer oral residence time (each tablet may take up to 10 minutes to dissolve), and children often spit them out, terminating their exposure to buprenorphine.  When tablets are swallowed by children, the buprenorphine in Suboxone tablets is absorbed to a far lesser extent compared with film.

13.     Even the packaging of the film presented drawbacks relative to the packaging of the tablets.  Each dose of film was packaged in a child-resistant sleeve.  Once the sleeve was opened, it no longer afforded any child resistance.  Reckitt supplied no child-resistant bottle or other container into which unused portions of doses of film — those that would be left over for that significant fraction of patients who, Reckitt knew, took their Suboxone in divided doses —

could safely be placed.  By contrast, Suboxone tablets were supplied in a childproof bottle into which a patient could safely place unused portions of split Suboxone tablets.  Moreover, the child-resistant sleeve increased the street value of diverted product, because it guaranteed product identity, and, therefore, purity.

14.     Patients did not prefer Suboxone film to Suboxone tablets, either; they preferred the tablets by a wide margin.  The film formulation was more irritating to a patient's oral mucosa than the tablet.  Reckitt could not profitably charge more for Suboxone film than it was charging for Suboxone tablets.  Reckitt had to charge less for Suboxone film.

**2.     Reckitt's Motives for Introducing Suboxone Film Were Predatory**

15.     Even from Reckitt's perspective, the new film formulation was more costly and difficult to manufacture than the existing tablet formulation.  Reckitt did not expect the new film formulation to garner it any additional sales or revenues, lower its costs, or increase its efficiency, over and above the tablet formulation.  Reckitt did not expect to be able to charge more for Suboxone film than Suboxone tablets.  In fact, Reckitt fully expected to lose sales and revenues, increase its costs, and decrease its efficiency by developing and marketing Suboxone film.  And that is precisely what happened.

16.     But none of that mattered to Reckitt.  Reckitt was willing to sacrifice profits on Suboxone because the sole purpose and effect of its costly plan to develop the film were not to provide a better or improved product, but simply to protect Reckitt's Suboxone profits by thwarting, delaying and/or mitigating the impact of competition from generic Suboxone tablets by raising would-be generic competitors' costs and excluding them from the most efficient means of distributing their generic Suboxone tablet products, via the automatic pharmacy substitution mechanism.

**B.**      **Step Two:  Reckitt Destroys Demand for Suboxone Tablets**

17.     After the FDA approved the film version of Suboxone, Reckitt took affirmative (and costly) steps to destroy demand for Suboxone tablets and simultaneously coerce physicians to prescribe, and patients to take, Suboxone film, which did not face imminent generic competition.

18.     First, Reckitt raised the price for Suboxone tablets, in order to make it unattractive to patients and payers and thereby drive demand to Suboxone film.

19.     Second, Reckitt purposely refrained from packaging Suboxone tablets in childproof unit-dose packaging, a packaging configuration it had already used (since 2005) for its co-formulated buprenorphine/naloxone tablets in Canada and the United Kingdom.  Reckitt refrained from implementing unit dose packaging for Suboxone tablets in the United States — despite knowing as early as 2007, if not earlier, that pediatric exposure rates were very high for Suboxone — simply to degrade the quality of Suboxone tablets relative to Suboxone film.

20.     Third, using its sales force that visits doctors (called "detailers"), Reckitt falsely disparaged Suboxone tablets to doctors and payers.

21.     Fourth, with generic Suboxone tablets poised to enter the market, Reckitt announced in or around September of 2012 that it was discontinuing the sale of Suboxone tablets altogether.

22.     Because of Reckitt's anticompetitive scheme, by the time generic manufacturers start selling their generic tablet versions of Suboxone, the prescription base for Suboxone tablets will have been almost entirely destroyed due to Reckitt's coercive tactics; the vast majority of prescriptions are already being written for the film version of Suboxone.

23.     Reckitt took each and every one of these steps with a single goal in mind:  to destroy demand, and the prescription base, for Suboxone tablets and thereby prevent generic versions of Suboxone tablets from effectively competing with branded Suboxone using the most efficient means by which that competition is intended to take place:  automatic generic substitution at the pharmacy counter.

**C.      Step Three:  Reckitt Holds ANDA Approvals Hostage**

24.     Third, Reckitt engaged in anticompetitive actions to block and delay would-be generic Suboxone tablet sellers from obtaining FDA approval of their Abbreviated New Drug Applications ("ANDAs") for generic Suboxone tablets.  Reckitt did this by sabotaging the process by which it and the generic Suboxone tablet ANDA filers needed to finalize and submit an FDA-required shared REMS for Suboxone tablets.  The requirement of a shared REMS was communicated by FDA on January 6, 2012.  FDA required the shared REMS, but did not contemplate, much less authorize, that Reckitt would use the requirement of a shared REMS to try to block and delay ANDA approval.  In fact, given that it had just approved Reckitt's Suboxone tablet REMS in December of 2011, FDA contemplated rapid development of a shared REMS.

25.     But Reckitt, knowing that such a joint submission to FDA was the final prerequisite to FDA approval of the pending Suboxone tablet ANDAs, and realizing that it was a required participant, sabotaged the joint process by slowing it down, running the clock, and drawing it out for as long as it could, refusing to participate, placing pretextual conditions on its participation, and asserting thin pretexts to disguise its transparently anticompetitive intentions.

26.     Reckitt's sabotage of the joint process has been documented in writing by the various generic drug companies holding Suboxone tablet ANDAs, who formed the

Buprenorphine Products Manufacturers Group.  Those companies are Actavis, Inc. (located in Parsippany, New Jersey), Amneal Pharmaceuticals LLC (located in Bridgewater, New Jersey), Ethypharm USA Corp. (located in Philadelphia, Pennsylvania), Mylan Inc. (located in Canonsburg, Pennsylvania), Roxane Laboratories Inc. (located in Columbus, Ohio), Sandoz Inc. (located in Princeton, New Jersey), Sun Pharmaceuticals Industries, Ltd. (located in Cranbury Township, New Jersey), and Teva Pharmaceuticals USA, Inc. (located in North Wales, Pennsylvania).  Those companies reported to the FDA that Reckitt:

        a.      merely feigned cooperation with the shared REMS development process;

        b.      refused to participate in meetings with the generic ANDA filers;

        c.      when it did attend meetings, refused to discuss any substantive issues with the generic ANDA filers pertaining to the shared REMS;

        d.      placed conditions on its cooperation with the shared REMS development process that it knew the ANDA filers could not agree to (such as to assume Reckitt's tort liability by contract, which had nothing to do with the development of a joint REMS and would have caused the ANDA filers' liability insurers to disclaim coverage);

        e.      refused to share information with the generic ANDA filers about the existing REMS program that was essential to the shared REMS development process;

        f.      just before a shared REMS was to be submitted to FDA in August of 2012, raised a last-minute issue merely to cause still further delay; and

        g.      stopped participating altogether in September of 2012.

      27.      Reckitt's sabotage of the shared REMS development process was intended to, and did, delay FDA's approval of one or more Suboxone tablet ANDAs.

D.     **Step Four:  Reckitt Files a Sham "Citizen Petition"**

28.     After the generic Suboxone tablet ANDA filers submitted a shared REMS program of their own to FDA in August of 2012, Reckitt knew that the possibility existed that FDA would decide to accept the generics-only shared REMS, as submitted or with modification, and then approve one or more generic Suboxone tablet ANDAs.  In an attempt to prevent that from occurring, Reckitt changed tactics.  On September 25, 2012, Reckitt filed an objectively baseless "citizen petition" with FDA in an attempt to delay FDA approval of ANDAs for generic Suboxone tablets further.  Reckitt's petition asked FDA to withhold approval of generic Suboxone tablet ANDAs unless (1) the ANDA contains a targeted pediatric exposure education program, (2) the ANDA product has child-resistant unit-dose packaging, and (3) FDA determines that Reckitt did not discontinue marketing branded Suboxone tablets for reasons of safety.

29.     Reckitt's petition was filed for the sole purpose of maximally interfering with competition by delaying FDA approval of generic Suboxone tablet ANDAs only when its strategy of sabotaging the shared REMS development process was no longer guaranteed to work.  At no time, during the months preceding Reckitt's petition, while Reckitt was feigning cooperation with the shared REMS development process, did Reckitt share with the generic Suboxone tablet ANDA filers any of the information contained in Reckitt's petition.  Instead, Reckitt kept its petition and its contents a tactical surprise.  Given the purported safety-related bases of Reckitt's petition, Reckitt's secrecy — as well as its failure to take the very actions to protect patients that it sought to require of the generic tablet sellers — exposes the tactical, anticompetitive nature of the petition.  Companies with genuine safety concerns do not keep them a secret.  Companies with genuine safety concerns seek to adjust their own existing

products, not just the products of other companies.  Companies with genuine safety concerns do not use them tactically.

30.     Reckitt's petition was also objectively baseless.  No reasonable petitioner could possibly expect to succeed on the merits of the petition Reckitt filed.  Reckitt's petition lacked any reasonable regulatory, scientific, medical, or other reasonable basis.  FDA lacked the statutory authority to withhold approval of generic Suboxone tablet ANDAs on the bases cited by Reckitt, or to require the actions Reckitt sought to impose on the ANDA filers.  Reckitt's petition lacked clinically meaningful evidence that lent support to its assertions or that bore on the approvability of generic Suboxone ANDAs.  Reckitt's petition stood no chance of affecting FDA policy or procedure.  In short, it was a sham.

31.     Evidence demonstrating the absence of a reasonable basis for Reckitt's petition abounds.  Regarding Reckitt's pediatric exposure education program, there existed no statutory or regulatory basis for requiring its inclusion in any Suboxone ANDA.  Reckitt had not included such an education program in its own New Drug Application ("NDA") or any supplement to its NDA.  Regarding unit-dose packaging, Reckitt's petition did not reference FDA's previously stated positions, but instead flatly ignored them.  Reckitt knew from a letter FDA wrote to it in March of 2010 that FDA had long since concluded that, because of the high fraction of patients that took Suboxone in divided daily doses, unit-dose packaging did not ameliorate, and might even exacerbate, the known high incidence of accidental pediatric buprenorphine exposure.  "Because patients are known to divide tablets, it may be expected that patients will remove films from the package and have partial doses that are neither in the child-resistant pouch nor in a child-resistant medication bottle," FDA said.  Regarding the issue of whether Reckitt's removal of Suboxone tablets from the market was for reasons of safety, there existed no statutory or

regulatory grounds for such a determination based on the container closure system employed to package a drug, the sole basis upon which Reckitt premised its request.  And as Reckitt well knows, it did not remove Suboxone tablets from the market for reasons of safety; Reckitt simply lied to the FDA.

**E.**     **Reckitt's Scheme Was Intended To, And Did, Harm Competition**

32.     Reckitt's scheme, as a whole and in its individual parts, was intended to, and has, blocked and delayed generic Suboxone competition, disrupted the normal channels, and the statutory and regulatory mechanisms, by which generic competition takes place and was prescribed by Congress to take place, and excluded would-be generic competitors from the most efficient means of distributing their products.

33.     Reckitt's exclusionary motive is also illustrated by its willingness to sacrifice profits as part of its product change strategy.  Reckitt's decisions to incur the extra costs (and suffer the revenue losses) associated with the change in Suboxone's dosage form from tablets to film and the discontinuation of Suboxone tablets were economically rational only because those changes had the exclusionary effect of suppressing generic competition.  But for the impact on generic competition, Reckitt would not have invested the resources necessary to develop Suboxone film and destroy the prescription base for Suboxone tablets, because it would have been economically irrational to do so.

34.     Reckitt's exclusionary motive is betrayed by its prior conduct.  Reckitt's pattern and *modus operandi* is to respond to the threat of competition by deploying anticompetitive schemes containing precisely the signature features its Suboxone scheme had.  For instance, in the case of its drug Gaviscon (marketed in the United Kingdom), just before the inception of generic competition to Gaviscon Original Liquid, Reckitt discontinued that product, to force

physicians and patients to prescribe its new Gaviscon formulation, Gaviscon Advance Liquid, which pharmacists could not substitute with pending generic versions of Gaviscon Original Liquid. Reckitt was fined for its conduct and admitted that its conduct was anticompetitive.

35.     To the extent it is even permitted to do so, Reckitt cannot justify its scheme by pointing to any offsetting consumer benefit. The enormous cost savings offered by generic drugs (and, correspondingly, the anticompetitive harm caused by suppressing generic competition to Suboxone) outweigh any cognizable, nonpretextual procompetitive justifications Reckitt could possibly offer.

36.     Any cognizable justifications Reckitt could offer for its scheme are, in fact, pretexts. And, whatever justifications Reckitt may offer, Reckitt did not need to engage in the conduct challenged in this lawsuit to achieve them.

37.     If Reckitt were simply and solely interested in introducing a new Suboxone film product to compete on the merits with Suboxone tablets, it could have done so without taking the additional, affirmative steps described herein to:  (a) delay the market entry of less-expensive generic versions of Suboxone tablets; (b) interfere with the normal competition that routinely occurs between branded products and their generic counterparts as contemplated by the Hatch-Waxman Act; and (c) destroy the prescription base for Suboxone tablets.

38.     If Reckitt were simply and solely interested in modifying the container closure system for Suboxone in the United States to contain a unit-dose packaging feature, it could have done so, as it has done in several other countries since 2005, without reformulating Suboxone's dosage form into a film and destroying the prescription base for Suboxone tablets.

39.     As a result of some or all of its illegal scheme, Reckitt (1) illegally maintained and extended its monopoly in the market for co-formulated buprenorphine/naloxone; (2) fixed,

raised, maintained, and/or stabilized the price of co-formulated buprenorphine/naloxone at supra-competitive levels; and (3) overcharged Plaintiff and other direct purchasers of Suboxone by millions of dollars by depriving them of the benefits of competition from cheaper generic versions of Suboxone.

40.     Reckitt's monopoly power, as alleged more fully below, was maintained through willfully exclusionary conduct, as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.  Neither Reckitt's scheme as a whole, nor any of its constituent parts, constituted competition on the merits.

41.     As alleged in more detail below, Reckitt violated § 2 of the Sherman Act through its overarching scheme to improperly maintain and extend its monopoly power by foreclosing or delaying competition from lower-priced generic versions of Suboxone.

### III.     JURISDICTION AND VENUE

42.     This Complaint is filed and these proceedings are instituted under section 4 of the Clayton Act, 15 U.S.C. § 15(a), to recover threefold damages and the costs of suit and reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class (defined below) of direct purchasers of Suboxone from Reckitt, resulting from violations by Reckitt, as hereinafter alleged, of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

43.     Reckitt transacts business within this district, and carries out interstate trade and commerce, in substantial part, in this district and/or has an agent and/or can be found in this district.  Venue is appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c).

## IV.    THE PARTIES

44.     Plaintiff Rochester Drug Co-Operative, Inc. is a stock corporation duly formed and existing under the New York Cooperative Corporations Law, and is located at 50 Jet View Drive, Rochester, New York 14624.  Plaintiff purchased Suboxone directly from Reckitt during the Class Period, as defined below, and was injured by the illegal conduct described herein.

45.     Defendant Reckitt Benckiser, Inc. is a Delaware corporation with its principal place of business located at Morris Corporate Center IV, 399 Interpace Parkway, Parsippany, New Jersey 07054.  This defendant manufactures and markets numerous products, including pharmaceuticals subject to FDA approval, and was in whole or in part responsible for some or all of the conduct alleged above and below and attributed to Reckitt.

46.     Defendant Reckitt Benckiser LLC is a Delaware limited liability company with its principal place of business located at Morris Corporate Center IV, 399 Interpace Parkway, Parsippany, New Jersey 07054.  This defendant manufactures and markets numerous products, including pharmaceuticals subject to FDA approval, and was in whole or in part responsible for some or all of the conduct alleged above and below and attributed to Reckitt.

47.     Defendant Reckitt Benckiser Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located at 10710 Midlothian Turnpike, Suite 430, Richmond, Virginia 23235.  This defendant manufactures and markets numerous products, including pharmaceuticals subject to FDA approval, and was in whole or in part responsible for some or all of the conduct alleged above and below and attributed to Reckitt.

48.     Defendant Reckitt Benckiser Healthcare (UK) Ltd. is a British corporation incorporated under the laws of England and Wales, with its registered office located at Dansom Lane, Hull, North Humberside HU8 7DS.  This defendant manufactures and markets numerous

products, including pharmaceuticals subject to FDA approval, and was in whole or in part

responsible for some or all of the conduct alleged above and below attributed to Reckitt.

49.     Defendant Reckitt Benckiser Group plc is a British corporation incorporated

under the laws of England and Wales, with its registered office located at 103-105 Bath Road,

Slough, Berkshire, SL1 3UH.  This defendant manufactures and markets numerous products,

including pharmaceuticals subject to FDA approval, and was in whole or in part responsible for

some or all of the conduct alleged above and below attributed to Reckitt.

50.     All of Reckitt's actions described in this complaint are part of, and in furtherance

of, the illegal monopolization and attempted monopolization alleged herein, and were authorized,

ordered, and/or done by Reckitt's various officers, agents, employees, or other representatives

while actively engaged in the management of Reckitt's affairs (or that of their predecessors-in-

interest) within the course and scope of their duties and employment, and/or with the actual,

apparent, and/or ostensible authority of Reckitt.

## V.     CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action on behalf of itself and, under Rules 23(a) and (b)(3) of

the Federal Rules of Civil Procedure, as representative of a Class defined as follows:

> All persons or entities in the United States and its territories who
> purchased Suboxone in any form directly from Reckitt at any time
> during the period October 8, 2009 through the present (the
> "Class").

Excluded from the Class are Reckitt, its officers, directors, management, employees,

subsidiaries, and affiliates, and all federal governmental entities.

52.     Members of the Class are so numerous that joinder is impracticable.  Plaintiff

believes the Class numbers in the dozens.  Further, the Class is readily identifiable from

information and records in the possession of Reckitt.

53.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Reckitt, *i.e.*, they paid artificially inflated prices for co-formulated buprenorphine/naloxone products and were deprived of the benefits of competition from less-expensive generic versions of Suboxone tablets as a result of Reckitt's wrongful conduct.

54.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

55.    Plaintiff is represented by counsel who is experienced and competent in the prosecution of class action antitrust litigation, and has particular experience with class action antitrust litigation in the pharmaceutical industry.

56.    Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Reckitt has acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Reckitt's wrongful conduct.

57.    Questions of law and fact common to the Class include:

a.    whether Reckitt unlawfully maintained monopoly power through all or part of its overarching scheme;

b.    whether Reckitt's anticompetitive scheme suppressed generic competition to Suboxone;

c.    whether Reckitt's introduction of Suboxone film and destruction of the prescription base for Suboxone tablets were predatory and anticompetitive;

d.    whether Reckitt's sabotage of the development process for a shared REMS was anticompetitive;

e.      whether a reasonable petitioner would have expected to the arguments made in Reckitt's "citizen petition" to succeed;

f.      whether Reckitt's "citizen petition" was submitted to interfere with competition;

g.      as to those parts of Reckitt's challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Reckitt's challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the market(s) in which Suboxone is sold;

h.      whether direct proof of Reckitt's monopoly power is available, and if available, whether it is sufficient to prove Reckitt's monopoly power without the need to also define a relevant market;

i.      to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

j.      whether Reckitt's scheme, in whole or in part, has substantially affected interstate commerce;

k.      whether Reckitt's scheme, in whole or in part, conduct caused antitrust injury to the business or property of Plaintiff and the members of the Class in the nature of overcharges; and

l.      the quantum of overcharges paid by the Class in the aggregate.

58.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that
numerous individual actions would engender.  The benefits of proceeding through the class
mechanism, including providing injured persons or entities with a method for obtaining redress
on claims that might not be practicable to pursue individually, substantially outweigh any
difficulties that may arise in management of this class action.

59.     Plaintiff knows of no difficulty to be encountered in the maintenance of this
action that would preclude its maintenance as a class action.

### VI.     OTHER FACTUAL ALLEGATIONS

**A.     <u>Characteristics of the Pharmaceutical Marketplace</u>**

60.     The marketplace for the sale of prescription pharmaceutical products in the
United States contains a significant feature that can be exploited by manufacturers in order to
extend a monopoly in the sale of a particular pharmaceutical composition.  In most industries,
the person responsible for paying for a product is also the person who chooses which product to
purchase.   When the same person has both the payment obligation and the choice of products,
the price of the product plays a predominant role in the person's choice of products and,
consequently, manufacturers have a strong incentive to lower the price of their products to
maintain profitability.

61.     The pharmaceutical marketplace, by contrast, is characterized by a "disconnect"
between the payment obligation and the product selection.  State laws prohibit pharmacists from
dispensing many pharmaceutical products, including co-formulated buprenorphine/naloxone, to
patients without a prescription written by the patient's physician.  The prohibition on dispensing
certain products without a prescription introduces a "disconnect" in the pharmaceutical
marketplace between the payment obligation and the product selection.  The patient (and in

many cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's physician chooses which product the patient will buy.

62.     Many pharmaceutical manufacturers, including Reckitt, exploit this feature of the pharmaceutical marketplace.  The so-called "brand manufacturers" (*i.e.*, the manufacturers of branded, as opposed to generic, pharmaceuticals) employ large forces of sales representatives, known as "detailers," who visit physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products.  Importantly, these detailers do not advise the physicians of the cost of the branded products.  Studies show that physicians typically are not aware of the relative costs of branded pharmaceutical products and that, even when physicians are aware of the relative cost, they are insensitive to price differences, because they do not pay for the products themselves.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

63.     In situations in which two manufacturers each sell a drug that serves a similar medical function and each manufacturer uses a significant detailer force, those products are often sold at very similar, high prices, thus eliminating any consumer benefit from that "competition." This is in stark contrast to the situation in which the competing seller of an AB-rated, bioequivalent drug is a generic company without a detailer force.  In that case, the generic price is significantly lower than the brand price, and consumers benefit as Congress intended by the Hatch-Waxman Act, discussed below.

64.     When the relative importance of the price between two branded pharmaceuticals, or pharmaceuticals that otherwise are not AB-rated to one another, is low, the price elasticity of demand — the extent to which sales go down when price goes up — is by definition also low, which in turn gives brand manufacturers the ability to raise or maintain price substantially above

competitive levels without losing sales.  The ability to raise price above competitive levels

without losing sales is referred to by economists and antitrust courts as market power or

monopoly power.  Thus, the net result of the pharmaceutical industry features and marketing

practices described above often is to allow brand manufacturers to gain and maintain monopoly

power.

65.     Congress sought to ameliorate the "disconnect," and to restore some of the normal

competitive pressures to the pharmaceutical marketplace, by authorizing the manufacture and

sale of generic pharmaceuticals under the Hatch-Waxman Act, discussed below.  When a

pharmacist receives a prescription for a branded pharmaceutical product, and an AB-rated

generic version of that product is available, state laws permit (or in some cases require) the

pharmacist to dispense the generic product in lieu of the branded product.  In this way, the

importance of price is reintroduced to the product selection decision at the pharmacy counter,

and the pharmaceutical marketplace "disconnect" is ameliorated between the AB-rated generic

product and the corresponding branded product.  When an AB-rated generic product is

introduced and is not prevented from competing unfettered, branded pharmaceutical

manufacturers are no longer able to exploit the features of the pharmaceutical industry, their

monopoly power dissipates, and some of the normal competitive pressures are restored.

66.     If Reckitt's unlawful conduct had not prevented generic manufacturers from

successfully entering the market with generic versions of Suboxone, direct purchasers would

have saved millions of dollars in the purchase of co-formulated buprenorphine/naloxone.

Reckitt's anticompetitive scheme purposely manipulated generic competition to Suboxone.

**B.**     **The Regulatory Structure Pursuant to Which Generic Substitutes for Brand-Name Drugs Are Approved**

67.     Under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301-392), manufacturers who create a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

68.     In 1984, Congress amended the Food, Drug and Cosmetic Act with the enactment of the Hatch-Waxman amendments, called the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman").

69.     Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

70.     The ANDA relies on the scientific findings of safety and effectiveness included by the brand-name drug manufacturer in the original NDA.

71.     In order to be substitutable for a branded product at the pharmacy counter, and approvable by FDA as AB-rated to a particular branded product, a generic product must be, among other things, "pharmaceutically equivalent" (same dosage form and strength) and "bioequivalent" (exhibiting the same drug absorption characteristics) as the branded product.

72.     FDA regulations, which are concerned only with safety and efficacy and not with effects on competition, permit branded manufacturers to seek FDA approval to modify the dosage form and strength of their existing products. An unscrupulous brand manufacturer that anticipates the onset of generic competition to its drug could modify the dosage form, strength,

or some other characteristic of its product from, say, A to $A_1$, for no reason other than to prevent

generic competition to A.  Before the generic manufacturer receives FDA approval for the

generic version of A and enters the market, the brand manufacturer might get approval for $A_1$

and use various coercive tactics to cause physicians to write prescriptions only for $A_1$ instead of

A.  The branded manufacturer's modification of A to $A_1$ may thereafter cause the manufacturer

of the generic version of A to garner few or no sales, to because its product is not substitutable

for $A_1$.

C.      **The Availability of Citizen Petitions to Delay FDA Approval of Generic Drugs**

73.      Section 505(j) of the Food, Drug and Cosmetic Act creates a mechanism by which

a person may file a petition with the FDA requesting, among other things, that the agency take,

or refrain from taking, any form of administrative action. This mechanism is commonly referred

to as a "citizen petition."

74.      Citizen petitions provide an forum for individuals to express and support their

genuine concerns about safety, scientific, or legal issues regarding a product anytime before, or

after, its market entry.

75.      Other than the form of such citizen petition, the regulations place no restrictions

on the subject matter of a citizen petition.

76.      The FDA regulations concerning citizen petitions require the FDA Commissioner

to respond to each citizen petition within 180 days of receipt.  That response may be to approve

the request in whole or in part, or deny the request.  The Commissioner also may provide a

tentative response with an estimate on a time for a full response.

77.      Reviewing and responding to citizen petitions is a resource-intensive and time

consuming task because, no matter how baseless a petition may be, the FDA must research the

petition's subject, examine scientific, medical, legal and sometimes economic issues, and

coordinate internal agency review and clearance of the petition response.  These activities strain the FDA's limited resources, and lengthy citizen petitions can delay FDA approval of generic products even if those petitions ultimately are found to lack any reasonable evidentiary, regulatory, statutory or scientific basis.

78.    Abusive and anticompetitive citizen petitions have become an increasingly common problem in the last several years as brand name companies have sought to compensate for dwindling new product pipelines.  In some such cases, citizen petitions have been filed with respect to ANDAs that have been pending for a year or more, long after the brand name manufacturer received notice of the ANDA filing, and have had the (intended) effect of delaying the approval of the generic product while the FDA evaluates the citizen petition.

79.    Delaying generic competition is a lucrative strategy for an incumbent manufacturer.  Given the marketplace's preference for generic products over brand names, the cost of filing an improper citizen petition may be trivial compared to the value of securing even a few months' delay in a generic rival's entry into the market.

80.    FDA officials have acknowledged abuses of the citizen petition process.  Former FDA Chief Counsel Sheldon Bradshaw noted that in his time at the agency he had "seen several examples of citizen petitions that appear designed not to raise timely concerns with respect to the legality or scientific soundness of approving a drug application but rather to try to delay the approval simply by compelling the agency to take the time to consider arguments raised in the petition whatever their merits and regardless of whether or not the petitioner could have made those very arguments months and months before."

81.    Similarly, in July 2006, Gary Buehler, R.Ph., former Director of the Office of Generic Drugs Center for Drug Evaluation and Research at FDA, noted that of 42 citizens

petitions raising issues about the approvability of generic products, "very few... have presented data or analysis that significantly altered FDA's policies." Of these 42, only three petitions led to a change in FDA policy on the basis of data or information submitted in the petition.

82.     It is the practice of the FDA, well known in the pharmaceutical industry, to withhold ANDA approval until after its consideration of and response to a citizen petition is complete. On this subject, Director Buehler acknowledged that "[i]t is very rare that petitions present new issues that CDER has not fully considered, but the Agency must nevertheless assure itself of that fact by reviewing the citizen petitions."

**D.     Generic Versions of Brand-Name Drugs are Significantly Less Expensive, and Take Significant Sales Directly From the Corresponding Brand-Name Versions**

83.     Typically, generic versions of brand-name drugs are priced significantly below the brand-name versions. Because of the price differentials, and other institutional features of the pharmaceutical industry, generic versions are liberally and substantially substituted for their brand-name counterparts. In particular, generic drugs that are pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to their brand name counterparts are given an "AB" rating by the FDA. Pharmacists substitute an AB-rated generic product for the corresponding brand-name product unless the doctor has indicated that the prescription for the brand-name product must be "dispensed as written." As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers, and the loss of sales volume by the brand-name drug to the corresponding generics accelerates.

84.     Reckitt was well aware of this impending loss of Suboxone sales volume. As reflected in Reckitt's 2008 Annual Report, Reckitt knew that Suboxone tablets would lose 80% or more of their sales to less-expensive generic equivalents within the first year of competition,

and that it stood to lose hundreds of millions of dollars after generic Suboxone tablets entered the market.

85.     Generic competition enables all members of the proposed Class to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the brand-name drug at a reduced price.  However, until a generic manufacturer enters the market, there is no bioequivalent generic drug to compete with the brand-name drug, and therefore the brand-name manufacturer can continue to charge supracompetitive prices profitably without losing all or a substantial portion of its brand-name sales.  Consequently, brand-name drug manufacturers have a strong incentive to use various tactics, including those alleged above, to delay the introduction of generic competition into the market.

E.     **Effects on Competition and Damages to Plaintiff and the Class**

86.     Reckitt's overarching anticompetitive scheme to suppress generic competition to Suboxone tablets has, both as a whole and in its individual parts, delayed and prevented the sale of generic Suboxone, both by delaying its availability and, through Reckitt's destruction of demand for Suboxone tablets, by suppressing the ability of generic Suboxone tablets to compete by depriving would-be generic versions of the most efficient means of competition under the governing statutory and regulatory regime.

87.     Reckitt's overarching anticompetitive scheme delayed or prevented the sale of generic Suboxone tablets in the United States, and unlawfully enabled Reckitt to sell Suboxone at artificially inflated prices.  But for Reckitt's illegal conduct, generic competitors would have been able to compete, unimpeded, with generic versions of Suboxone tablets.  Generic competitors would also have been able to compete earlier, as early as October of 2009, and additional generic competitors would have entered the market thereafter.  Reckitt's challenged

27

conduct thereby delayed and prevented the savings that purchasers of Suboxone would have experienced from unfettered generic competition.

88.     Specifically, if manufacturers of generic Suboxone tablets had been able to enter the marketplace and effectively compete with Reckitt earlier or without Reckitt's having switched the market to Suboxone film, as set forth above, Plaintiff and other members of the Class would have substituted lower-priced generic Suboxone tablets for the higher-priced brand-name Suboxone tablets for some or all of their co-formulated buprenorphine/naloxone requirements, and/or would have paid lower prices for some or all of their remaining branded Suboxone purchases.

89.     Reckitt's scheme, however, has deprived the manufacturers of generic Suboxone tablets of the cost-efficient means of distribution and limited the generic tablets — whose introduction into the market Reckitt's scheme has delayed — to only a small fraction of co-formulated buprenorphine/naloxone prescriptions, which did discourage (and will discourage) generic manufacturers from developing and launching less-expensive competing generic versions of Suboxone tablets altogether.

90.     During the relevant period, Plaintiff and other members of the Class purchased substantial amounts of Suboxone directly from Reckitt.  As a result of Reckitt's illegal conduct as alleged herein, Plaintiff and other members of the Class were compelled to pay, and did pay, artificially inflated prices for their co-formulated buprenorphine/naloxone requirements. Plaintiff and the other Class members paid prices for co-formulated buprenorphine/naloxone that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) class members were deprived of the opportunity to purchase lower-

priced generic Suboxone tablets instead of expensive brand-name Suboxone; and/or (2) the price

of branded Suboxone was artificially inflated by Defendants' illegal conduct.

91.     As a consequence, Plaintiff and other members of the Class have sustained

substantial losses and damage to their business and property in the form of overcharges, the exact

amount of which will be the subject of proof at trial.

**F.      Effect on Interstate Commerce**

92.     At all material times, Suboxone, manufactured and sold by Reckitt, was shipped

across state lines and sold to customers located outside its state of manufacture.

93.     During the relevant time period, in connection with the purchase and sale of

Suboxone, monies as well as contracts, bills and other forms of business communication and

transactions were transmitted in a continuous and uninterrupted flow across state lines.

94.     During the relevant time period, various devices were used to effectuate the

illegal acts alleged herein, including the United States mail, interstate and foreign travel, and

interstate and foreign telephone commerce.  The activities of Reckitt, as alleged in this

Complaint, were within the flow of, and have substantially affected, interstate commerce.

**G.      Monopoly Power**

95.     At all relevant times, Reckitt had monopoly power over co-formulated

buprenorphine/naloxone, because it had the power to raise and/or maintain the price of co-

formulated buprenorphine/naloxone at supracompetitive levels without losing substantial sales.

96.     To the extent that Plaintiff is required to prove monopoly power circumstantially

by first defining a relevant product market, Plaintiff alleges that the relevant product market is all

co-formulated buprenorphine/naloxone products — *i.e.*, Suboxone in all its forms and dosage

strengths and generic co-formulated buprenorphine/naloxone products.  But for Reckitt's illegal

conduct, multiple firms would be marketing co-formulated buprenorphine/naloxone.

97.     A small but significant, non-transitory price increase by Reckitt to Suboxone would not have caused a significant loss of sales to other drugs or products used for the same purposes (other than AB-rated generic Suboxone).

98.     Suboxone does not exhibit significant, positive cross-elasticity of demand with respect to price, with any opioid dependence treatment or other product other than AB-rated generic versions of Suboxone.

99.     Reckitt needed to control only Suboxone and its AB-rated generic equivalents, and no other products, in order to maintain the price of Suboxone profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Suboxone would render Reckitt unable to profitably maintain its prices for Suboxone without losing substantial sales.

100.    Reckitt also sold branded Suboxone well in excess of marginal costs, and in excess of the competitive price, and enjoyed unusually high profit margins.

101.    Suboxone is unique and not reasonably interchangeable with other therapies for the treatment of opioid addiction.  Suboxone is unique in that it is an opioid replacement therapy (unlike Naltrexone).  Suboxone is unique in that it is a maintenance therapy (unlike Subutex — Reckitt's buprenorphine product not co-formulated with naloxone — which is recommended only for induction treatment, and is thus a complement to, not a substitute for, Suboxone).  Suboxone is unique in that it is the only FDA-approved opioid replacement maintenance therapy (unlike methadone, which has never been formally approved by FDA).  Suboxone is unique in that it is the only opioid replacement maintenance therapy that is a Schedule III drug under the Controlled Substances Act and can be prescribed in an office setting under the Drug Addiction Treatment Act (DATA) of 2000 (unlike methadone, which is a Schedule II drug, and must be

administered in a clinic setting).  Suboxone is unique in that it is the only opioid replacement maintenance therapy that is co-formulated with an opioid antagonist (naloxone) to deter abuse. Suboxone is unique in that it is the only opioid replacement maintenance therapy that is only a partial (as opposed to full) agonist of the μ-opioid receptor; thus, unlike methadone or other full agonists, Suboxone's unique properties create a "ceiling effect" that prevents larger doses of buprenorphine from producing greater agonist effects, protecting patients against death by respiratory depression or overdose.  This property also affords Suboxone a unique efficacy profile:  unlike methadone, which is prescribed for a patient population suffering from severe forms of opioid addiction, Suboxone is suitable only for patients with mild to moderate forms of opioid addiction.

102.    The relevant geographic market is the United States and its territories.

103.    At all relevant times, Reckitt enjoyed high barriers to entry with respect to the above-defined relevant market due to regulatory protections and the high costs of entry and expansion.

104.    Reckitt's market share in the relevant market is and was 100% at all times.  But for Reckitt's conduct, one or more firms would have earlier been marketing generic versions of co-formulated buprenorphine/naloxone and would have reduced Reckitt's share in the relevant market considerably.

## VII.    CLAIMS FOR RELIEF

### CLAIM I:  VIOLATION OF 15 U.S.C. § 2
### (MONOPOLIZATION AND MONOPOLISTIC SCHEME)

105.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

106.    At all relevant times, Reckitt possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Reckitt possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

107.    Through its overarching anticompetitive scheme, as alleged extensively above, Reckitt willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff and the Class thereby.

108.    It was Reckitt's conscious object to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

109.    Reckitt's scheme harmed competition as aforesaid.

110.    To the extent Reckitt is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for Reckitt's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects.  Even if there were some conceivable such justification that Reckitt were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose.

111.    As a direct and proximate result of the Reckitt's illegal and monopolistic conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

## CLAIM II: VIOLATION OF 15 U.S.C. § 2
## (ATTEMPTED MONOPOLIZATION)

112.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

113.    Reckitt, through its overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market.  It was Reckitt's conscious objective to control prices and/or to exclude competition in the relevant market.

114.    The natural and probable consequence of Reckitt's overarching anticompetitive scheme, which was intended by it and plainly foreseeable to it, was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

115.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Reckitt will succeed in and achieve its goal of maintaining monopoly power in the relevant market.

116.    As a direct and proximate result of Reckitt's illegal and monopolistic conduct, Plaintiff and the Class were harmed as aforesaid.

## VIII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Direct Purchaser Class, respectfully prays that the Court:

A.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare the Plaintiff the representative of the Direct Purchaser Class;

B.   Enter joint and several judgments against Reckitt and in favor of Plaintiff and the Direct Purchaser Class;

C.   Award the Direct Purchaser Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial; and

D.   Award Plaintiff and the Direct Purchaser Class their costs of suit, including reasonable attorneys' fees as provided by law.

## IX.   JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiff, on behalf of itself and the proposed Class, demands

a trial by jury on all issues so triable.

Respectfully submitted,

Dated: February 13, 2013

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (fax)
farnan@farnanlaw.com

Peter B. Andrews
Craig J. Springer
FARUQI & FARUQI, LLP
20 Montchanin Road
Suite 145
Wilmington, DE 19807
(302) 482-3182
(302) 482-3612 (fax)
pandrews@faruqilaw.com

Peter Kohn
Joseph T. Lukens
FARUQI & FARUQI, LLP
101 Greenwood Avenue
Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com

Barry S. Taus
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane
Suite 1204
New York, NY 10038
(212) 931-0704
btaus@tcllaw.com

Eric L. Cramer
David F. Sorensen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net